James W. **PARTAIN** et al., Plaintiffs-Appellants,

v.

The **FIRST NATIONAL BANK OF MONTGOMERY**, Defendant-Appellee.

No. 72-1207.

United States Court of Appeals, Fifth Circuit.

Sept. 13, 1972.

Robert S. Vance, Birmingham, Ala. (Callaway & Vance, Birmingham, Ala., of counsel), for plaintiffs-appellants.

Steiner, Crum & Baker, M. R. Nachman, Jr., Robert E. Steiner, III, Montgomery, Ala., for defendant-appellee.

C. B. Arendall, Jr., Larry V. Sims, Mobile, Ala. (Hand, Arendall, Bedsole, Greaves and Johnston, Mobile, Ala.),

amicus curiae for First National Bank of Mobile.

William E. Shinn, Jr., Norman W. Harris, Decatur, Ala., amicus curiae for State National Bank of Alabama.

Thomas H. Watkins, Jackson, Miss. (Watkins & Eager, Jackson, Miss., of counsel), amicus curiae for First National Bank of Jackson, Miss.

Vardaman S. Dunn, Jackson, Miss. (Cox & Dunn, Jackson, Miss., of counsel), amicus curiae for Deposit Guaranty National Bank of Jackson, Miss.

Before WISDOM and INGRAHAM, Circuit Judges, and BOOTLE, District Judge.

BOOTLE, District Judge:

The three plaintiffs, suing for themselves and all other holders of Bank-Americards issued by First National Bank of Montgomery, sued said Bank under 12 U.S.C.A. § 86, alleging that through the use of said credit cards the Bank charged plaintiffs and their class usurious interest. The plaintiffs appeal from rendition of summary judgment against them, D.C., 336 F.Supp. 65. We reverse.

Plaintiffs alleged that during the period of two years next preceding the filing of their complaint in credit card transactions with plaintiffs and others similarly situated the defendant bank knowingly took, received, reserved and charged interest greater than that allowed by the laws of Alabama and demanded judgment as follows: (1) the sum of $3,500,000.00 together with interest according to law; or such other sum as represents the aggregate of the following: (a) twice the amount of interest paid within two years next preceding the filing of this complaint by all members of this class; and (b) such additional interest as has been charged to but not paid by members of the class within two years next preceding the filing of this complaint; (2) attorneys' fees and costs of this action, and (3) such other relief as the court may deem just and proper.

Defendant's motion to dismiss invoked this ruling of the District Court:

"This Court is clear that the correct reading of the cases of Tiffany v. National Bank of Missouri, 85 U.S. 409 [18 Wall. 409, 21 L.Ed. 862] (1873) and National Bank v. Johnson, 104 U.S. 271 [26 L.Ed. 742] (1881) is that the national banks of a state are authorized to charge the highest rate of interest for any sort of lending permitted by that state. Thus, it appears that defendant and all other national banks in Alabama are allowed to charge the rate of interest authorized for small loan companies. See Title 5, § 290, Alabama Code.

"While defendant is permitted to charge this rate of interest, it is possible that plaintiffs will be successful in proving their allegation that defendant has charged more than the rate legally allowed. Accordingly, a cause of action has been stated.

"The denial of defendant's motion to dismiss is without prejudice to its filing a motion for summary judgment accompanied by relevant data in support of its contention that it has not, in fact, exceeded the interest rate legally allowed."

Then followed defendant's motion for summary judgment supported by the following factual showing. None of the three plaintiffs ever had an outstanding balance in his account with defendant exceeding $300.00.[1] During the two year

---

1. The Alabama Small Loan Act of 1959 authorizes licensees thereunder to "contract for and receive interest on any loan of money not exceeding three hundred dollars ($300) an amount at a rate not exceeding 3% a month on that part of the unpaid principal balance not in excess of two hundred dollars ($200), two per cent a month on that part of the unpaid principal balance in excess of two hundred dollars ($200) but not exceeding three hundred dollars ($300)." Code of Alabama, Title 5, Section 290(1).

Said Act proscribes compounding and advance payment of interest, saying: "Interest or charges on loans made under this article shall not be paid, deducted, discounted or received in advance or com-

period involved plaintiff Partain paid finance charges totaling $27.95; plaintiff Willis paid finance charges totaling $18.81, and plaintiff Wooten paid finance charges totaling $27.97.[2] For the purposes of the motion for summary judg-

pounded . . ." Section 290(3), but provides that interest may be precomputed and added to the principal of the loan and that every payment may be applied to the combined total of principal and precomputed charge until the amount is fully paid and that the acceptance of such payment shall not constitute compounding or advance payment of interest. Section 290(3)(a).

Under the Act no loan contract shall provide for "any scheduled repayment of the cash advance more than twenty-five (25) calendar months from the date of making such contract of loan" and each contract "shall require payment of the cash advance and charges in installments which shall be payable at approximately equal periodic intervals". Section 290 (9). Interest at the small loan rates may be charged for "six months after the due date of the final installment of principal or interest" but "after the expiration of said six months period interest may be charged at a rate not to exceed eight per cent per annum." Section 290 (10).

2. The Bank has agreements with merchants, airlines, motels, and hotels (members) under which holders of Bank Americards can make purchases up to the limitation of a line of credit established by defendant for each card holder, the members being authorized to accept the credit card as payment. The charge cards are then deposited by the member to his account with defendant. The card holders' agreement with the Bank obligates them to repay the Bank the amount of said deposits and to pay a finance charge where applicable in accordance with billings and current customer payment schedule including a reasonable attorney's fee in event of suit. There is no finance charge if the account is paid in full within twenty-five days after the closing date of the initial periodic statement and no finance charge will be made for extensions of credit made in any billing cycle thereafter if each periodic extension of credit is paid in full before the end of the succeeding billing cycle. Where cash is advanced by defendant to the card holder (such cash advances during the first quarter of 1970 amounted to about 8% of the total of the bank's credit card volume, and during the second quarter to about 6 or 7%), there is a finance charge of 1 and ½% (18% annual percentage rate) imposed at the closing date of the first periodic statement pertaining thereto; on other extensions of credit a finance charge of 1 and ½% (18% annual percentage rate) on balances up to $300.00, and 1% (12% annual percentage rate) on balances in excess of $300.00 (minimum finance charge 50¢) is computed on the previous balance excluding credits and payments made during the billing cycle.

The method of determining the amount of the finance charge on extensions of credit other than cash is as follows:

"PERIODIC RATES CHART

| "Periodic Rates | Range of Balances | Annual Percentage Rate |
|---|---|---|
| 1½% | up to $300 | 18% |
| 1 % | Over $300 | 12% |
| Minimum Finance Charge — 50¢." | | |

The "Extended Payment Chart" is set forth in the card holder's agreement as follows:

| "If new balance is: | Minimum payment is: |
|---|---|
| $ 1.00 to $10.00 | Balance |
| $ 10.01 to $200.00 | $10.00 |
| $200.01 to $300.00 | $15.00 |
| $300.01 to $400.00 | $20.00 |
| $400.01 to $500.00 | $25.00 |
| $500.01 and above — 5% of balance in | |
| | multiples of $5.00." |

In making a finance charge where applicable defendant computes the same on the basis of the balance as of the end of the previous billing cycle and that previous balance includes the previous cycle's finance charge if there was one. The Bank's witness expressed it this way:

"Q. . . How is the actual finance charge each month—how is the actual finance charge arrived at . . ?

  *    *    *    *    *

"A. The computer picks up the previous month's unpaid balance and computes one and a half percent of that figure.

"Q. Let's look on exhibit 2 by way of example, and I noticed that the balance as of October 6th, 1970, was $61.59

  .  .  .

  *    *    *    *    *

"A. All right.

"Q. And I notice that on October 22nd, the customer apparently made a ten dollar payment?

"A. Uh hum.

  *    *    *    *  ·  *

ment, the Bank stated that it would assume that the finance charge which it received was "interest", but that if the case were tried on the merits it would expect to prove that such finance charge covered many items in addition to interest and that the interest charged was considerably less than the finance charge. Assuming that the entire finance charges represented interest, the rate of interest paid by plaintiff Partain was on an annual basis 17.2675%, by plaintiff Willis 15.3365%, and by plaintiff Wooten 14.-7095%. Calculated on the daily average balance method total charges to the three accounts on a monthly basis ranged from zero to 2.14%, reaching the latter figure in only one billing cycle.

The District Court granted summary judgment on the theory that the factual issues contended for by plaintiffs were irrelevant. These issues as stated in the District Court's order were "such questions as the criteria for the extension of credit, the use of credit cards and the manner in which interest is computed." These issues, as restated on appeal are: "(a) the type of borrower and the rela-

tive risk connected therewith, (b) the amounts of transactions to which the contemplated interest charged will be applied, (c) the uses and purposes of the extension of credit, (d) whether interest is or is not compounded, (e) the term of the loan, and (f) whether attorneys' fees are allowed." The District Court's dispositive ruling was: "Inasmuch as the plaintiffs have accepted defendant's computation of the interest they were charged, it would appear that these questions are not now relevant." We think it was the thinking of the District Court that unless the interest charged actually exceeded the 3% a month on the first $200.00 and the 2% a month on the next $100.00 allowed by the Small Loan Act plaintiffs could not complain even though the Bank violated the Small Loan Act's command that "interest or charges on loans made under this article shall not be . . . compounded." In so thinking and ruling, we think the trial court was in error for reasons hereinafter stated, but first we must come to the question of jurisdiction.

"Q. And then on November 4, 1970, the finance charge was computed, am I correct, ninety-two cents finance charge?
"A. Correct.
"Q. Now, what I would like to ask you is, is the ninety-two cents a finance charge on $61.59, or is it the finance charge on $51.59?
"A. $61.59.
"Q. Is this the way it is always done?
"A. Yes.
"Q. In computing a finance charge on any given billing date for purposes of making that computation, do I correctly understand that the customer is not given credit for payments made during the interval since the last billing date?
"A. That is correct.
"Q. And this is uniform throughout all of these accounts, isn't it, in every month?
"A. This is correct.
"Q. Has that been the uniform method of computation ever since the system has been in effect there?
"A. The Bank Americard, yes, sir." (Dep. pp. 44–46).
The method of handling finance charges for cash advances is somewhat different.

The Bank's witness explains it this way:
"Q. I notice on exhibit 3 that there is a sixty cent charge with 'ICSC' which I speculate to mean instant cash, service charge—is that reasonably close?
"A. Yes, that is what it is.
"Q. And how is that computed, sir?
"A. It is one and a half percent of the amount of cash advanced within the month in which it is drawn.
"Q. So, this particular customer drew forty dollars on the tenth of February, and then seven days later was charged one and a half percent of that forty dollars as a—what is labeled a service charge for the instant cash?
"A. Yes.
"Q. That just goes along with the regular finance charge and is added into the balance for that month?
"A. Yes." (Dep. pp. 46–47).
The range of credit extended to individual credit card customers is $100.00 to $2000.00. The stated limits of the three plaintiffs' cards are $300.00, which does not include the availability to the plaintiffs of nationwide agreements, which, for example, allow each to charge up to $500.00 for airline tickets.

## JURISDICTION

In the District Court the plaintiffs claimed jurisdiction solely under 28 U.S. C.A. § 1355, which reads:

"The district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress. June 25, 1948, c. 646, 62 Stat. 934."

The defendant did not challenge the Court's jurisdiction and the Court did not expressly rule upon the issue of jurisdiction. In this court, however, several banks as *Amici Curiae* filed briefs vigorously attacking the claim of jurisdiction under § 1335, and insisting that the court is without jurisdiction, no claim having been made that the jurisdictional amount under § 1331(a) exists. Whereupon plaintiffs, while stoutly insisting that § 1355 confers jurisdiction, advanced 28 U.S.C.A. § 1337 as an alternative source of jurisdiction. These *Amici* acknowledge that a casual reading of § 1355 might indicate merit in plaintiffs' claim of jurisdiction under it and acknowledge further that an appreciation of the merit of their objection requires a close and patient study and analysis of the interplay and historical development of 28 U.S.C.A. § 1355 and of the National Bank Act and several succeeding statutes dealing with federal court jurisdiction and venue. These *Amici* point out that the position urged by them here was adopted in Williams, et al. v. American Fletcher National Bank and Trust Company, 348 F.Supp.

963 (S.D.Ind.1970), and also by the United States District Court for the District of Idaho by entry of and order of dismissal in the case of Colson et al. v. First Security Bank of Idaho, Civil No. 1–71–43 (July 13, 1971).

█ We find it unnecessary to decide whether the District Court had jurisdiction under 28 U.S.C.A. § 1355 because we are convinced that it had jurisdiction under 28 U.S.C.A. § 1337 which provides in pertinent part:

"The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . ."

In Imm v. Union Railroad Company, 289 F.2d 858 (3d Cir. 1951) it was pointed out that there is an increasing recognition of the breadth of this provision. Quoted with approval was Professor Charles Bunn, Jurisdiction and Practice of the Courts of the United States 71–72 (1949), as follows: " 'Acts regulating commerce' are coming rapidly to mean all acts whose constitutional basis is the commerce clause." *Imm's* specific holding is that the Federal Employers' Liability Act is an Act "regulating commerce" and that therefore the District Courts have jurisdiction of suits arising thereunder regardless of amount in controversy.[3]

█ *Imm* was followed in Murphy v. Colonial Federal Savings & Loan Association, 388 F.2d 609 (2d Cir. 1967), where it was noted that the liberal construction of § 1337 was unanimously approved by commentators and was at least inferentially approved by the 1958 Con-

---

3. *Imm* points out that among the statutes which have been held to be acts "regulating commerce" under § 1337 are Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1281 et seq.; Anti-Trust Acts, 15 U.S.C.A. §§ 1–33; Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq.; Civil Aeronautics Act, 49 U.S.C.A. § 401 et seq.; Communications Act of 1934, 47 U.S.C.A. § 151 et seq.; Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.; National Labor Relations Act, 29 U.S.C.A. § 151 et seq.; Railway Labor Act, 45 U.S.C.A. § 151 et seq.; Shipping Act, 46 U.S.C.A. § 801 et seq.; Steamboat Inspection Laws, 46 U.S.C.A. § 404; Tennessee Valley Authority, 16 U.S.C.A. §§ 831–831dd; United States Warehouse Act, 7 U.S.C.A. § 241 et seq. To which may be added Soil Bank Act, 7 U.S.C.A. §§ 1801–1837 as held in Caulfield v. U. S. Department of Agriculture, 293 F.2d 217 (5th Cir. 1961), and The Federal Consumer Credit Protection Act, 15 U.S.C.A. § 1601 et seq. See Sosa v. Fite, 5 Cir. 1972, 465 F.2d 1227.

gress when the jurisdictional amount was increased to $10,000.00.[4] The specific holding in *Murphy* is that the Home-owners' Loan Act of 1933 is an act regulating commerce and that in a suit brought under that act by a dissident group in a fight for control of a federal savings and loan association the jurisdictional amount is not required. The court pointedly ruled:

"It is true that federal regulation of finance is not grounded in the commerce power alone. As Chief Justice Hughes explained in Norman v. B. & O. R.R., 294 U.S. 240, 303, 55 S.Ct. 407, 414, 79 L.Ed. 885 (1935):

'The broad and comprehensive national authority over the subjects of revenue, finance and currency is derived from the aggregate of the powers granted to the Congress, embracing the powers to lay and collect taxes, to borrow money, to regulate commerce with foreign nations and among the several states, to coin money, regulate the value thereof, and of foreign coin, and fix the standards of weights and measures, and the added express power "to make all laws which shall be necessary and proper for carrying into execution" the other enumerated powers.'

"See also McCulloch v. State of Maryland, 17 U.S. (4 Wheat.) 316, 406, 4 L.Ed. 579 (1819). But to found ju-risdiction upon § 1337, it is not requisite that the commerce clause be the exclusive source of Federal power; it suffices that it be a significant one." 388 F.2d at 615.

Thus while the $10,000.00 figure applies to federal question cases under 28 U.S.C. § 1331(a), a long series of particular statutes including 28 U.S.C.A. § 1337 grant jurisdiction, without regard to the amount in controversy, in many of the areas which otherwise would fall under the general federal question statute 28 U.S.C.A. § 1331. Wright, Law of Federal Courts 108 (1970).

Even more in point factually is Cupo v. Community National Bank & Trust Co. of N. Y., 438 F.2d 108 (2d Cir. 1971) holding that the National Bank Act is an act regulating commerce for purposes of § 1337. Plaintiff Cupo sued under 12 U.S.C.A. § 61 giving a shareholder the right of cumulative voting; these three plaintiffs sue under 12 U.S.C.A. § 86 giving the right to recover usurious interest paid. *Cupo* convincingly disposes of contentions there made that *Murphy* followed by *Cupo*, was at variance with the Congressional policy behind the enactment of 28 U.S.C.A. §§ 1348 and 1349.

As above stated, we hold that the trial court had jurisdiction under 28 U.S.C.A. § 1337, and it is not necessary for us to decide whether it also had jurisdiction under 28 U.S.C.A. § 1335.

4. "While this bill applies the $10,000 minimum limitation to cases involving Federal questions, its effect will be greater on diversity cases since many of the so-called Federal question cases will be exempt from its provisions. This is for the reason that Federal courts are expressly given original jurisdiction without limitation as to the amount claimed in a great many areas of Federal law. For example, regardless of the amount claimed, the Federal courts have jurisdiction in copyright, patent, and trademark cases. Employees [sic] Liability Act, Fair Labor Standards Act, antitrust, ICC, freight rate, and many other types of cases coming under our commerce acts also give original jurisdiction to the Federal courts without limitation as to the amount involved. Other types of cases are admitted to the Federal courts without regard to the jurisdictional amount by special Federal statutes as, for example, suits involving civil rights, and suits under the Miller Act. When all of these types of cases are eliminated, the only significant categories of 'Federal question' cases subject to the jurisdictional amount are suits under the Jones Act and suits contesting the constitutionality of State statutes. In both of these types of cases the amount claimed usually exceeds $10,000.00." S.Rep.No. 1830, 85th Congress, 2d Sess., 2 U.S.Code Cong. & Ad.News, pp. 3099, 3103 (1958).

Professor Wright suggests that even Jones Act suits come within the scope of § 1337. Wright, Law of Federal Courts, 109 (1970).

*MERITS*

█ The amount of interest permissible to national banks is fixed by 12 U.S.C.A. § 85, reading in pertinent part:

"Any association may . . . charge on any loan . . . interest at the rate allowed by the laws of the State . . . where the bank is located . . . and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed . . . ."

The next Code section, 12 U.S.C.A. § 86, provides in pertinent part:

"The taking, receiving, reserving, or charging a rate of interest greater than is allowed by the preceding section, when knowingly done, shall be deemed a forfeiture of the entire interest . . . . In case the greater rate of interest has been paid, the person by whom it has been paid, . . . may recover back, . . . twice the amount of the interest thus paid . . . ."

Thus the rate to be charged by national banks is permitted by federal law to be determined by the laws of the State in which the national bank is located. This interplay between the federal statute and State usury laws is elucidated by Evans v. National Bank, 251 U.S. 108, 40 S.Ct. 58, 64 L.Ed. 171 (1919): "The National Bank Act establishes a system of general regulations. It adopts usury laws of the states only insofar as they severally fix the rate of interest"; by National Bank v. Johnson, 104 U.S. 271, 26 L.Ed. 742 (1881): "The sole particular in which national banks are placed on an equality with natural persons is as to the *rate* of interest, and not as to the character of contracts they are authorized to make . . . .", and by Farmers' & Mechanics' Nat. Bank v. Dearing, 91 U.S. 29, 23 L.Ed. 196 (1875): "[T]he States can exercise no control over them [national banks], nor in anywise affect their operation, except in so far as Congress may see proper to permit." Obviously, national bank loans are not required in all their characteristics to fit snugly into the mold used by State lending institutions to shape their loans. A delineation of the precise extent to which conformity is required or variances permitted does not lie within the scope of this opinion.[5] We leave for

5. The Comptroller of the Currency has issued a number of rulings and authored a number of opinions bearing on this question. His interpretative ruling, paragraph 7.7310 states: "If state law permits a higher interest rate on a specified class of loans, a national bank making such loans at such higher rate is subject only to the provisions of state law relating to such class of loans that are *material to the determination of the interest rate*." (Emphasis supplied). In his Digest of Opinions, paragraph 9510 states: "Where State law permits a higher-than-ordinary interest rate on specified classes of loans (for example, small loans), a national bank which makes loans at such special rate is subject to all limitations of substance *with respect to size, maturity of the loan, and the like*, which are prescribed by the State statute authorizing the higher rate." (Emphasis supplied). In a letter signed by one of his Deputies to the Director, Department of Banking, Lincoln, Nebraska, dated June 21, 1941, he stated: "[A]s to loans made at higher than ordinary interest rates, the specifications of the state statute with respect to maturity, size and method of repayment of the loan would be applicable since they are component parts of the laws permitting higher than ordinary interest charges." And in a letter signed by one of his Deputies, dated June 14, 1941, he stated: "A New York State commercial bank, located in Syracuse, operating a personal loan department under Subsection 2 of Section 108 of the New York Banking Law, may make loans in amounts not exceeding $1,500 at an interest rate of 12% per annum upon unpaid balances. A New York industrial bank may make loans up to $5,000, discounting 6% in advance, even though the loan is to be repaid in periodic installments. A national bank located in Syracuse would have its choice of either or both of these methods with respect to loans of the size covered by the particular statutory provision. It is very clear that the intent of Congress in this connection was to enable national banks to meet the competition

decision by the District Court if such decision becomes necessary, the question of just what provisions of the Alabama Small Loan Act "with respect to size, maturity of the loan, and the like" are binding upon defendant bank when it undertakes to operate under the aegis of that law in Alabama. For the purposes of this case it will suffice to say that the rate of interest allowed by the laws of the State is the maximum which defendant bank could charge. And we have it upon the authority of the Supreme Court, Citizens' National Bank v. Donnell, 195 U.S. 369, 25 S.Ct. 49, 49 L.Ed. 238 (1904), that "The rate of interest which a man receives is greater when he is allowed to compound than when he is not, the other elements in the case being the same", and that thus the prohibition of compounding does affect the "rate of interest" within the meaning of 12 U.S.C.A. §§ 85 and 86. The *Donnell* case involved the laws of Missouri and their effect upon the National Banking Act. The statutes of Missouri allowed parties to contract in writing for the payment of interest on interest and stipulated "but the interest shall not be compounded oftener than once in a year." The Citizens National Bank encountered that prohibition by its compounding of the semi-annual interest. The Supreme Court said:

"The plaintiff in error denies that the prohibition of compounding oftener than once a year affects the 'rate of interest' within the meaning of those words in U.S.Rev.Stat. § 5198 [now 12 U.S.C.A. § 86] . . . and

contends that so long as the total sums received would not amount to more than 8 per cent on the debt, it has a right to charge them under U.S.Rev. Stat. § 5197 [now 12 U.S.C.A. § 85] . . . coupled with Mo.Rev.Stat. § 3706 [allowing 8%] . . . . We are of a different opinion. The rate of interest which a man receives is greater when he is allowed to compound than when he is not, the other elements in the case being the same. Even if the compounded interest is less than might be charged directly without compounding, a statute may forbid enlarging the rate in that way, whatever may be the rules of the common law. The supreme court of Missouri holds that that is what the Missouri statute has done. On that point, and on the question whether what was done amounted to compounding within the meaning of the Missouri statute, we follow the state court . . . . Therefore, since the interest charged and received by the plaintiff was compounded more than once a year, it was at a rate greater than was allowed by U.S.Rev.Stat. § 5197 . . . and it was forfeited."

■ That brings us to the question whether what appellee bank did would be held by the Supreme Court of Alabama to be compounding as proscribed by the Alabama Small Loan Act, saying: "interest or charges on loans made under this article shall not be . . . compounded . . . ." Code of Alabama, Title 5, § 290(3)(a) and § 290(8) providing further that "if any amount in

of individuals or state banking institutions in connection with any loan which might arise, but it was not intended that a national bank should be free to charge interest at a rate which no actual or potential competitor, individual or corporate, could legally charge. In other words, although Section 103 of the New York Banking Law permits a 12% interest rate upon certain loans, as outlined above, this does not mean that a national bank located in Syracuse could make a commercial loan of $100,000 at a rate of 12% per annum, since the highest rate which any competing individual or state banking

institution could charge on such a loan would be 6%. As pointed out by both the Senate and House committees in connection with the Banking Act of 1933, Section 5197 'limits the interest that may be charged by a national bank to that which may be charged by local banks in the State where the national bank is located.' This Congressional interpretation necessarily followed from the language of Section 5197, which allows interest to be charged 'at the rate allowed by the laws of the State * * * where the bank is located * * * and no more.'"

excess of the charges permitted by this article is charged, contracted for, or received, except as the result of an accidental and bona fide error of computation, the contract of loan shall be void . . . ." As appears from footnote 2, no finance charge is made if the account should happen to be *paid in full* within twenty-five days after the closing date of the *initial* BankAmericard periodic statement. And there will be no finance charge for extensions of credit made in any billing cycle *thereafter if* each period's extension of credit is paid *in full* before the end of the succeeding billing cycle. But on other extensions of credit a finance charge is computed on the *previous balance excluding credits and payments made during the billing cycle.* Thus, during any billing cycle (excluding the period in advance of the first closing date) in which the account is not paid in full a finance charge is computed and imposed on the *previous* balance, including, of course, whatever carrying charge or interest has already been added to and included in that previous balance. Thus, at the end of a cycle the computer looks up at the previous cycle's balance and computes and imposes thereon the interest or carrying charge on that balance "excluding credits and payments made during the billing cycle." This means regardless of whether or not 99% of that previous balance had been paid on the first day following the posting of that previous cycle's balance. It is apparent, therefore, that the bank not only compounded interest monthly, but it charged interest which was not even due. It charged it on the previous cycle's balance, which balance may represent purchases made the day before that balance was posted and which balance may have been substantially, that

is to say, almost fully paid the day after the carrying charge was imposed.

The bank contends that there was no "compound interest" because it says the charging of interest on past due interest has never been considered unlawful compounding under Alabama decisions, citing Smith v. Penn Mutual Life Insurance Co., 244 Ala. 610, 614, 14 So.2d 690 (1943); Gross v. Coffey, 111 Ala. 468, 477–478, 20 So. 428 (1895), and Paulling v. Creagh's Administrators, 54 Ala. 646, 655 (1875). It is questionable whether these cases can be construed to approve the charging of interest on interest whereby accrued interest is added periodically to the principal and interest is computed on the new principal thus formed, as distinguished from approving merely the allowance of interest on overdue installments of interest.[6] 45 Am. Jur.2d Interest and Usury, § 188 discusses compound interest as follows:

"Although in some jurisdictions an agreement to pay interest on interest is objectionable on the grounds of public policy, this principle has no application to, or bearing upon, the question as to whether or not a contract is usurious. It seems clear that there can be no objection on the ground of usury if the compounded interest does not exceed the amount of permissible simple interest, but where the total interest involved is in excess of this amount, the courts are not agreed as to whether agreements to pay interest on interest or to compound interest, are usurious. According to the view of one line of authorities, provided that the undertaking is not one to pay interest upon interest in all events and that the original contract does not provide for a higher rate of interest than the law authorizes, a con-

6. The distinction is thus expressed in an annotation in 10 A.L.R.3d 424: "Compound interest, it has been said, means interest on interest whereby accrued interest is added periodically to the principal, and interest is computed on the

new principal thus formed, and is to be distinguished from the mere allowance of interest on overdue installments of interest, which is not strictly compound interest."

tract contemporaneous with the original obligation, that unpaid interest shall itself bear interest, or shall from time to time become principal and bear interest as such, does not taint the original obligation with usury, unless intended as a cover for usurious interest, or unless the rests or periods for compounding are so frequent as to indicate an intention to evade the usury law. In other jurisdictions, compound interest, or interest upon interest, constitutes usury when contracted for contemporaneously with the creation of the principal debt.[12]

"[12] Eslava v. Lepretre, 21 Ala. 504; Mason v. Callendar, 2 Minn. 350, Gil 302, overruled on other grounds Talcott v. Marston, 3 Minn. 339, Gil 238."

"Although differences of opinion may exist as to the validity of an agreement to pay interest on interest, made before the interest has become due, there is no doubt that, if it is not retroactive, such an agreement made after the interest has become due is not open to objection."

Significantly, Am.Jur.2d cites the Alabama case, Eslava v. Lepretre, *supra,* for the statement that "compound interest, or interest upon interest, constitutes usury when contracted for contemporaneously with the creation of the principal debt". Eslava v. Lepretre is properly cited. It says at page 531:

"The agreement, however, of the 4th February, 1845, by which Eslava agrees that Lepretre shall be allowed to compound the interest on the mortgage debt, annually, for the term of four years, at the rate of 8 per cent, does not deserve the favor of a court of equity, and will not be enforced. It has been before remarked, that a court of equity regards with jealousy all arrangements made between the mortgagor and mortgagee, by which the latter obtains an advantage over the former not stipulated for in the mortgage deed itself. And while it will permit the mortgagee to state his account for interest past due, allowing rests, and compounding the interest at each rest, if they are not too frequent, considering the interest accrued already as a further advance; yet, acting on the principle that the parties do not deal on terms of strict equality, equity has held, that an agreement entered into at the time of the loan, for converting interest into principal from time to time as it shall become due, is oppressive and unjust, and tending to usury, and that, consequently, it cannot be supported."

The statement in *Eslava* that such agreements for interest entered into at the time of the loan do not deserve the favor of a court of equity can hardly mean that they would be enforced at law because in the later case of Stickney v. Moore, 108 Ala. 590, 19 So. 76 (1895), the Court said: "The rule in equity generally is, to allow interest whenever it would have been recoverable at law."[7]

7. The reason for the law's frowning upon advance agreements that interest once it accrues shall thereafter be added to the principal and bear interest along with the principal as expressed in the Alabama case, Eslava v. Lepretre, *supra,* is more recently enlarged upon in the case of Household Finance Corp. v. Goldring et al., 263 App.Div. 524, 33 N.Y.S.2d 514 (1942), aff'd in 289 N.Y. 574, 43 N.E.2d 715 as follows:

"We think the term 'compound interest', as it is commonly understood, applies to an agreement whereby interest thereafter to accrue automatically bears interest. Such agreements the law has refused to countenance principally for the reason that an improvident debtor is not likely to realize the extent to which the interest will accumulate. Though the term 'compound interest' may apply in certain other circumstanc-

It is doubtful, therefore, whether, if there were no prohibition in the Alabama Small Loan Act of compounding interest, the Supreme Court of Alabama would approve the futuristic arrangement for compounding interest employed in this case, whereby each monthly interest charge is to be added back to the principal at the end of each billing cycle and continue to bear interest as a part of the new principal.[8] But be that as it may, we are convinced that when the Small Loan Act says there shall be no compounding of interest it means that interest shall not be compounded whether or not such compounding would have been countenanced by prior Alabama law. This was the precise holding of the Second Circuit in Madison Personal Loan, Inc. v. Parker, 124 F.2d 143 (2 Cir., 1941). There Judge Clark, writing for himself, Judge Learned Hand, and Judge Frank, held as follows: "Certainly the drafters of the Uniform Small Loan Law could hardly have meant any more than that 'compounding' simply means interest on interest" whether or not such compounding would have been illegal or would have constituted a legal compounding according to the courts of the local jurisdiction prior to the enactment of the Small Loan Law. The Court recognized that New York cases had long held that "an agreement to pay interest on accrued interest is legal if the agreement is made after accrual and with consideration, but illegal if made in advance of accrual", but held that where a borrower owed a balance of principal and $1.10 interest and refinanced it under the Small Loan Law, either by a "renewal" or a "new" loan under which the $1.10 interest was included in the new principal and interest charged thereon, interest was thereby "compounded" in violation of the Small Loan Law.

The case of New Finance, Ltd. v. Ellis, 284 Ala. 374, 225 So.2d 784 (1969) convinces us that the Supreme Court of Alabama would be as hospitable to Madison Personal Loan, Inc. v. Parker, *supra*, as are we. In *New Finance, Ltd.*, the Court held that notwithstanding the rule obtaining in Alabama prior to the Small Loan Act that a stipulation for attorneys fees was permissible and would render a loan contract usurious, nevertheless in view of the policy underlying the enactment of the Small Loan Act and its disclosed "studied intent to make it strictly inclusive as to permissible charges to be assessed against the borrower" inclusion of a provision for payment of attorneys fees in loans sought to be justified under the Act was prohibited.

The regular interest rate permissible to the defendant bank was 8% per annum. Code of Alabama, Title 9, § 60. The charges made against the three plaintiffs exceeded 8% per annum. The bank seeks to justify these charges under the Act.[9] It is, therefore, bound by the maximum rates of interest allowed by the

---

es, we think it does not apply where interest has already fallen due and has become a debt which, like any other debt, may either be paid in cash or reloaned to the debtor under a new agreement that it shall bear interest. Such an agreement is not a snare which is likely to entrap the unwary, for the borrower cannot fail to realize the exact extent of his obligation. He may pay that interest in cash or, if the parties agree, he may arrange a new loan which will bear interest and, as here occurred, allow the interest to be deducted from the proceeds. In neither event does it seem to us that interest is compounded within the ordinary meaning of that term."

8. This arrangement is further objectionable because as heretofore indicated, the monthly finance charge is made on the "previous balance" whether that balance had existed for more than thirty days, or only one day, and regardless of whether it was going to continue to exist for thirty days or only one day.

9. There seems to have been an appreciation of the inadequacy of the Alabama Small Loan Act as a vehicle for launch-

Act, and it is bound by the Act's proscription of compounding. In view of the bank's stipulation that for the purposes of the determination of the motion for summary judgment all finance charges constituted interest, said charges are "greater than . . . allowed" because in excess of the regular 8% per annum and not justified under the Alabama Small Loan Act. In *Donnell,* the Supreme Court said: "Therefore, since the interest charged and received by the plaintiff was compounded more than once a year, it was at a rate greater than was allowed by U.S.Rev.Stat. § 5197 . . . and it was forfeited." Similarly, in this case, since the interest charged and received by the defendant was compounded it was at a rate greater than was allowed by the Federal statute and it was forfeited. It was error to grant summary judgment. The judgment is reversed and remanded for further proceedings not inconsistent herewith.

Reversed and remanded.

ing banks upon credit card careers employing finance charges as here utilized. The Alabama legislature enacted its "Consumer's Credit Transactions Law", effective October 1, 1971, regulating extensions of credit, including consumer loans, consumer credit sales, and consumer leases. It provides maximum finance charges for loans and sales and open end credit plans. Its Section 2 provides in part: "If the debt is created under an open end credit plan, the maximum finance charge in connection therewith shall be one and one-half (1½%) per cent per month on the unpaid balance from time to time thereunder." Apparently, even this new Act would not authorize the finance charge on the "previous balance" without credit being given for payments made since the last billing date. Georgia enacted a similar statute in 1969, its "Lender Credit Card Act", Ga.Code Ann. § 28–501 et seq., which provides in part: "Notwithstanding the provisions of any other law, on a revolving loan account a lender may receive or contract to receive and collect a loan finance charge in an amount not in excess of 1½ per cent. per month of either the average daily unpaid balance of the debt during the billing cycle, or of the unpaid balance of the debt on the

same day of the billing cycle." Id. § 28–504. CCH's four volume, loose-leaf Consumer Credit Guide indicates that the National Conference of Commissioners on Uniform State Laws, on July 30, 1968, approved the "Uniform Consumers Credit Code", which was approved also by the American Bar Association on August 7, 1968. It is an elaborate document which, *inter alia,* apparently would authorize banks to conduct a credit card operation. "The effect is to bring all creditors granting consumer credit under one comprehensive law. All are put on substantially equal footing with respect to maximum charges, rate ceilings, disclosure requirements, enforcement rights, contract terms, advertising requirements and administrative control . . . . Licensing requirements are imposed for lenders—but not sellers—who impose rates over 18%. Only supervised financial organizations—banks, credit unions, etc.—are permitted to charge more than 18% without being licensed." CCH Consumer Guide, Vol. 1, Par. 4775. This Code has been approved to date by Colorado, Idaho, Indiana, Oklahoma, Utah and Wyoming and has received consideration to varying extents by 41 other states. CCH Consumer Credit Guide, Vol. 1, Par. 4771.