**Mary D. HAAS, individually, and on behalf of all other persons similarly situated, Plaintiffs,**

**v.**

**PITTSBURGH NATIONAL BANK et al., Defendants.**

**Civ. A. No. 72-968.**

United States District Court, W. D. Pennsylvania.

Aug. 6, 1973.

Michael P. Malakoff, Berger & Kapetan, James H. Joseph, Eugene B. Strassburger, III, Pittsburgh, Pa., for plaintiffs.

Alexander C. Sherrard, William M. Hoffman, Campbell, Thomas & Burke, J. Tomlinson Fort, Edward W. Marsh, Thomas R. Wright, Reed, Smith, Shaw & McClay, Donald C. Bush, Philip A. Faix, Jr., Anderson, Moreland & Bush, Pittsburgh, Pa., for defendants.

OPINION

TEITELBAUM, District Judge.

This is a consumer class action brought by plaintiff, Mary D. Haas, individually and on behalf of a class of persons similarly situated, against defendants Pittsburgh National Bank (PNB), Mellon National Bank and Trust Company (Mellon) and Western Pennsylvania National Bank (WPNB), to recover statutory damages for alleged violation of the National Bank Act (12 U.S.C. §§ 85, 86), the Pennsylvania Goods and Services Installments Sales Act (69 P.S. § 1101 et seq.), the Pennsylvania Banking Code of 1965 (7 P.S. § 301 et seq.) and the Truth-In-Lending Act (15 U.S.C. § 1640).

Defendants presently, and during a period of two years preceding the filing of this action, have contracted to issue BankAmericard or Master Charge cards to numerous Pennsylvania residents.[1] The Master Charge and BankAmericard credit plans are generically referred to as revolving credit plans. The sequence of events surrounding their issuance and implementation is as follows:

A prospective cardholder must fill out and submit to defendant banks a credit application form which contains the individual's credit information and the terms of the agreement. The application is reviewed by the respective defendants and if it is approved, he is issued a plastic "BankAmericard" or "Master Charge" card. The cardholder may then purchase merchandise or services at various retail establishments which subscribe to the "BankAmericard" or "Master Charge" revolving credit plans and charge the price of such purchases to the revolving charge account established in his name by the defendants. The participating retail establishment submits a sales draft to the defendants for the cardholder's purchases and the defendants pay the face amount of the sales draft, less an agreed discount. Payment by a defendant bank on a "BankAmericard" or "Master Charge" sales draft constitutes a loan of money to the cardholder.[2] The cardholder thereafter receives by mail a thirty-day statement of his account. At his or her option, the cardholder may pay the cash price of purchases made on his revolving credit account up to thirty days following his previous billing date without paying a thirty-day charge. At that time, if the cardholder has still not paid the cash price for his purchases, the purchases are merged into the account for the purpose of establishing an outstanding balance upon which a one and

---

1. Defendants Mellon and WPNB issue Master Charge cards and defendant PNB issues BankAmericards.

2. Thus avoiding the trap of historical dogma embodied in the time-price doctrine which held that interest charged for the sale of goods did not fall within the ambit of usury statutes. See Note, Interest Incognito: Usury Statute Applied To Revolving Charge Account, 34 U.Pitt.L.Rev. 56 (1972).

one-quarter percent thirty-day interest charge is assessed.

In Count I of her complaint the plaintiff claims that the defendants' charge in excess of one percent per thirty days against her revolving credit account is usurious under the National Bank Act and the Pennsylvania Banking Code of 1965 in charging interest at a rate exceeding 12% per annum. The defendants contend that the statute applicable is 69 P.S. § 1501 which permits a finance charge of 15% per annum.

Payments and credits that occur subsequent to the previous billing date, are not deducted or otherwise taken into account in determining the outstanding balance upon which the finance charge is imposed. This system of calculating interest is referred to as the "previous balance method". Plaintiff's Second Count alleges that inasmuch as under this method money which may have been substantially paid the day after the carrying charge was imposed, the previous balance method of calculating interest violates the National Bank Act and the Goods and Services Installment Sales Act.

Count III of the complaint claims that it is unlawful to charge one and one-quarter percent on her revolving credit account's outstanding balance every thirty days instead of every calendar month because the effect is to charge an annual percentage rate in excess of one and one-quarter percent per month allowed by the National Bank Act and the Goods and Services Installment Sales Act.

Because the defendants allegedly compound interest, that is, charge interest on interest in computing the finance charge imposed on her revolving credit account, the plaintiff alleges in Count IV that the defendants violate the provisions of the National Bank Act and the Pennsylvania Goods and Services Installment Sales Act.

In Count V, the plaintiff claims that the defendants are understating the true annual interest rate on "Master Charge" and "BankAmericard" charge accounts by disclosing an annual percentage interest rate based on a 360 day year instead of a calendar year in violation of the Truth-In-Lending Act. It is as to this count that defendant PNB has moved for summary judgment.

The case is here on four motions submitted by the parties: (1) the motion of all defendants to dismiss Counts I through IV for lack of jurisdiction, (2) PNB's motion for summary judgment as to Count V of the complaint, (3) WPNB's motion to dismiss all counts for failure to state a cause of action against it and (4) plaintiff's motion for class determination. Although they are to some extent interconnected, the motions will be dealt with in the order set out above.

I.

Plaintiff contends that this Court has jurisdiction over Counts I through IV of her complaint by virtue of 28 U.S.C. § 1337, which provides, inter alia, that: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce. . . ." In addition, plaintiff contends that jurisdiction exists under 28 U.S.C. § 1355 which gives U. S. District Courts "original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress."

Defendants counter that jurisdiction exists under neither § 1337 nor § 1355 and in addition, urge that federal jurisdiction, should it be found, should be declined under the doctrine of abstention.

Jurisdiction is properly founded under 28 U.S.C. § 1337 over a cause of action arising under the National Bank Act. The National Bank Act is an "Act of Congress regulating commerce" within the meaning of that section.

The issues raised in this regard by the defendants have been recently and extensively considered by three Circuit Courts and in each instance subject matter jurisdiction was found to exist under § 1337. *Cupo v. Community National Bank & Trust Co. of New York,* 438 F.2d 108 (2d Cir. 1971), was an action to set aside the election of directors of a national bank. It was alleged that plaintiff had been wrongfully denied election as a director in violation of § 61 of the National Bank Act which guarantees the right of cumulative voting to shareholders of national banks. The *Cupo* court explicitly held that the National Bank Act is an act regulating commerce for purposes of § 1337, citing *Murphy v. Colonial Federal Savings and Loan Association,* 388 F.2d 609 (2d Cir. 1967) for that proposition.

■ Following the *Cupo* case, *Partain v. First National Bank of Montgomery,* 467 F.2d 167 (5th Cir. 1972) presented an almost identical fact situation to the case at hand. *Partain* was a class action brought under § 85 and § 86 of the National Bank Act by holders of BankAmericards issued by the defendant national bank, alleging that the defendant, through the use of the credit cards, had charged usurious interest in excess of that allowed by the Alabama Small Loan Act (Code of Ala., Tit. 5, § 290).[3] The *Partain* court, citing *Cupo* and *Murphy, supra,* expressly held that jurisdiction existed under 28 U.S.C. § 1337.

· Most recently, the Eighth Circuit *en banc* in *Burns v. American National Bank & Trust Co.* and *Fisher v. First National Bank of Chicago,* 479 F.2d 26 (8th Cir. 1973) held that jurisdiction existed as to a cause of action similar to the one presented herein under 28 U.S.C. § 1337. The Eighth Circuit originally decided that such jurisdiction did not exist, but upon rehearing changed their position in light of the *Cupo* and *Partain* decisions.

Thus, the Circuit Courts in the decisions cited above have met and disposed of each of the primary contentions raised by defendants collectively herein. Nevertheless, some discussion of these contentions is necessary.

First, as to whether the National Bank Act is an act regulating commerce within § 1337, it is to be noted that defendant banks do not contend that banking is not commerce. As the Supreme Court stated in *United States v. Philadelphia National Bank,* 374 U.S. 321, 336, n. 12, 83 S.Ct. 1715, 1727, 10 L.Ed. 2d 915 (1962) ". . . plainly, such an argument would have no merit." What defendants do attempt is a lengthy and complex historical analysis of legislation pertaining to national banks in this country, with particular attention to legislative history in the nineteenth century and the language contained in such venerable decisions as *Osborn v. Bank of the United States,* 9 Wheat. 738, 6 L. Ed. 204 (1824) and *McCulloch v. Maryland,* 4 Wheat. 316, 4 L.Ed. 579 (1819).

■ Defendants' arguments are largely inapposite, especially in light of the three recent decisions cited above. The fundamental source of the weakness of defendants' argument is the fact that the legal status of national banks under federal law has undergone a transformation through the years, rather than having remained static. As stated in Wright, Law of Federal Courts, § 32, p. 109, n. 33 (1970):

"As a matter of history it is probably true that the statute that is now 28 U.S.C.A. § 1337 was intended to apply only to cases under the original Interstate Commerce Act, as it had been amended prior to 1910, but its language is not so confined and it has been applied much more broadly."

---

3. The question of whether the rate of interest charged by a national bank is usurious is decided according to the law of the state in which the transaction occurs. *Schumacher v. Lawrence,* 108 F.2d 576 (6th Cir. 1940).

Bunn, in his Jurisdiction And Practice Of The Courts Of The U. S. (1949), states at pp. 71–72: "Acts regulating commerce are coming rapidly to mean all acts whose constitutional basis is the commerce clause."[4] Thus, in light of the *Burns, Cupo* and *Partain* decisions and the reasoning of the commentators, whatever may have been the state of the law during the time of John Marshall, today the National Bank Act is an act regulating commerce within the meaning of 28 U.S.C. § 1337 and thus § 1337 is sufficient to confer jurisdiction upon this Court.

Since jurisdiction is found to exist under § 1337 it is unnecessary to determine whether jurisdiction exists under 28 U.S.C. § 1355 and unnecessary to reach the ancillary question which defendants raise as to whether § 1355 confers exclusive jurisdiction or concurrent jurisdiction upon federal courts. In regard to these questions see First National Bank of Charlotte v. Morgan, 132 U.S. 141, 10 S.Ct. 37, 33 L.Ed. 282 (1889); Moore's Federal Practice, ¶ 0.60(8–3) (1970) pp. 624–25; but *cf.* Williams v. American Fletcher National Bank & Trust Co., 348 F.Supp. 963 (S. D.Ind.1970) and Colson v. First Security Bank of Idaho, No. 1–71–43 (S.D.Idaho 1971). .

Nor is it necessary to decide whether 28 U.S.C. § 1348 precludes federal jurisdiction under § 1337 by reason of the fact that § 1348[5] shows an intention of Congress to eliminate federal jurisdiction over national banks unless diversity and jurisdictional amount under 28 U.S. C. § 1331 or a federal question under 28 U.S.C. § 1332 are pleaded. This question, again an issue of historical vintage, was disposed of in both the *Burns* and *Cupo* decisions, supra. In both cases it was held that § 1348 was intended to eliminate the right of national banks to claim original federal or removal jurisdiction solely on the basis of their status as nationally chartered corporations. Both cases held that § 1348 was not intended to eliminate federal jurisdiction generally over suits involving national banks.

■ Finally defendant banks urge that this case presents an appropriate instance for the application of the abstention doctrine. Their basic contention is that this court should abstain because the decision of the case will necessarily entail the interpretation of uncertain state law. However, since § 85 of the National Bank Act[6] expressly adopts state law so that the state regulations become, in effect, federal law, a federal question is clearly presented, in the first

---

4. Moreover, The Commerce Clause need not be the exclusive source of federal power as argued by defendants. "It suffices that it be a significant one." Murphy v. Colonial, *supra* 388 F.2d at 615. See also Imm v. Union Railroad Co., 289 F.2d 858 (3d Cir. 1961).

5. Section 1348 provides as follows: "The district courts shall have original jurisdiction of any civil action commenced by the United States, or by direction of any officer thereof, against any national banking association, any civil action to wind up the affairs of any such association, and any action by a banking association established in the district for which the court is held, under chapter 2 of Title 12, to enjoin the Comptroller of the Currency, or any receiver acting under his direction, as provided by such chapter.

All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located."

6. § 85. Rate of interest on loans, discounts and purchases "Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate . allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more . . . "

instance. Moreover, defendants can cite this Court to no case in which a federal court has declined to interpret the state law involved in a penalty claim under the National Bank Act. The abstention argument of defendant banks is unfounded.

The motion of all three defendant banks to dismiss for lack of jurisdiction will be denied.

## II.

Defendant PNB has filed a motion for summary judgment as to Count V of plaintiff's complaint. In Count V, plaintiff claims that PNB, as well as defendants Mellon and WPNB, are understating the true annual interest rate on BankAmericard and Master Charge card accounts by disclosing an annual rate based upon a 360 day year, rather than a 365 day calendar year. If the rather complex computations involved can be segregated into their elements, it can be seen that, because this Court has no knowledge of one of the necessary elements of the equation, a question of fact exists which precludes summary judgment under the Federal Rules. F.R. Civ.P. 56(c).

The effective annual interest rate is obtained by dividing the annual rate of interest by the number of days used (365 or 360), then multiplying the unpaid balance by the percentage obtained, and then further multiplying that figure by either 30 or the exact number of days in the particular month. A different effective rate of interest than that quoted will result when the average daily account balance is calculated on, say, a 365-day year, when at the same time an annual rate of interest based on a 360-day year is being applied. The resulting difference is illustrated in this quotation from the Director of the Federal Reserve Board:

"The factor for a 360 day year when applied to 365 days a year at a rate of 1% per month on the unpaid balance would result in an annual percentage rate of 12.17% rather than the 12.-00% frequently quoted. However, such distortion would not take place if the payments are made on a monthly basis as agreed."[7]

In Silverstein v. Shadowlawn Savings and Loan Association, 51 N.J. 30, 237 A.2d 474 (1968), the three basic methods (the $^{360}/_{360}$, $^{365}/_{365}$ and $^{365}/_{360}$ methods respectively) for calculating interest on loans of money are explained. The *Silverstein* case explains that neither the $^{360}/_{360}$ method nor the $^{365}/_{365}$ method will result in a higher effective rate than that specified. The $^{365}/_{360}$ method however can result in a higher rate than that quoted. *Silverstein* explains that the $^{365}/_{360}$ method:

"is applied by dividing the annual rate of interest by 360, multiplying the unpaid balance by the percentage so obtained (the daily factor) and then further multiplying that result by the exact number of days in the particular month for which interest is being computed.

The arithmetical result of the computation method are several. The annual rate is increased by $\frac{1}{12}$nd of 1%, raising it in this case from 5.50% to approximately 5.57% for the balance of the term. (If an obligation called for interest at 6%, the actual rate would become about 6.08%)."[8]

It can be seen from the two examples above that in order to know the final figure it is necessary to know the rate expressed in days by which the average daily account balance is multiplied. Here, the Court is informed by defendant's affidavits that PNB utilizes a 360-day annual rate of interest. But we are given no information as to whether

---

7. CCH Consumer Credit Guide ¶30,321, letter dated March 3, 1970.

It cannot, of course, be assumed here that all cardholders in the class plaintiff claims to represent would uniformly make payments only on a "monthly basis as agreed".

8. 237 A.2d at 477.

the average daily account balance is figured at a 365 day or a 360 day rate.

PNB's motion for summary judgment will be denied.

### III.

On January 24, 1973, defendant WPNB filed an amended motion to dismiss all counts against it under the general heading of failure to state a cause of action. This amended motion will be considered in Part III.

In brief, WPNB contends that all counts in this action should be dismissed as to it because plaintiff, Mary D. Haas, alleges no transaction or other dealing with it. Plaintiff alleges that she holds a BankAmericard issued by PNB and that she has a Master Charge card issued by defendant Mellon. But she does not hold a Master Charge card issued by WPNB, even though that bank does issue such credit cards to its customers. WPNB contends that since Mary Haas has alleged no injury incurred at the hands of WPNB her complaint should be dismissed as to it for lack of standing.

WPNB's motion to dismiss presents a question which lies at the very heart of class actions under the Federal Rules of Civil Procedure—whether a plaintiff in a Rule 23 class action can maintain a suit against a named defendant if he cannot bring that action in his own right. The issue is one which requires the balancing of two important, and here countervailing, considerations: standing to sue and representative status under Rule 23.

█ The issue comes down to whether the named plaintiff's representative status in a Rule 23 class action can be of sufficient scope to cure whatever defects

may exist as to his standing. Stated as a bald proposition, it would seem that to pose this question is to answer it, for the concept of standing springs from a Constitutional imperative, whereas a named plaintiff's representative status merely arises out of the mandate of the Federal Rules. The Federal Rules, of course, confer no substantive rights upon the parties. Sibbach v. Wilson & Co., Inc., 312 U.S. 1, 61 S.Ct. 422, 85 L. Ed. 479 (1941). At any rate, under no circumstances could it be said that those remedies the Federal Rules do create rise to the pinnacle of Constitutional status.

█ The concept of standing however is Constitutionally based. Standing arises out of the requirement in Article III, Section 2 that judicial power be restricted to "cases" and "controversies". It is fundamental to the concept that a plaintiff must demonstrate injury to himself caused by the party or parties whom he sues before he can be said to have successfully stated a cause of action. Flast v. Cohen, 392 U.S. 83, 88 S. Ct. 1942, 20 L.Ed.2d 947 (1968), Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Stated differently, the test is whether the plaintiff or plaintiffs have alleged "a personal stake in the outcome of the controversy". Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) [9]

In line with the reasoning that the Constitutional origin of standing is determinative of the question is the decision in Weiner v. Bank of King of Prussia et al., 358 F.Supp. 684, (E.D.Pa. 1973). In *Weiner*, a single plaintiff brought a class action against twenty banks, alleging violation of the state and

---

9. However, it should be noted that a complainant has standing to challenge the legality of any action that injures him in fact so long as "the interest sought to be protected . . . is arguably within the zone of interests to be protected or regulated by the statute . . . . in question." Ass'n. of Data Processors v. Camp, 397 U. S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Plaintiff Haas would seem to fall within this broader formulation of standing criteria.

federal statutes [10] which regulate the calculation and disclosure of interest rates on loans. Plaintiff Weiner alleged that he was a customer of only one of the defendant banks (Central Penn National Bank), but claimed the right to sue on behalf of the customers of all banks in the district. District Judge Newcomer deemed standing to sue to be "an essential threshold which must be crossed before any determination as to class under Rule 23 can be made", and dismissed the complaint as to the nineteen banks with whom plaintiff had had no transaction.

The *Weiner* decision disposes of the question of whether representative status can cure defects in standing without answering it. *Weiner* overlooks the fact that it may be implicit in Rule 23 that once the class has been determined, whatever defects may exist as to the standing of the original named plaintiff can be cured by the eventual opting in (or more properly, under Rule 23(c)(2) failure to opt out) of class members who possess exactly those elements necessary to standing that the named plaintiff lacked. In this instance, for example, if the class is designated as those persons who hold BankAmericard and Master Charge accounts with the three defendant banks, may it not be properly anticipated under Rule 23 that at least one member of the numerous group of persons within the class will have obtained his or her Master Charge card from WPNB?

 It would seem that the above suggestion is entirely proper in a situation such as this, especially since the rule, at least in the Third Circuit, is that the District Court should make the class determination of class before it turns its attention to the merits of the cause of action (Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir. 1970)). See also

Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir., 1973).

In an attempt to arrive at a resolution of the conflict between standing and representative status, both plaintiff and WPNB cite this Court to its earlier ruling in Samuel et al. v. University of Pittsburgh et al., 56 F.R.D. 435 (W.D. Pa.1972). In *Samuel*, two married female graduate students at the University of Pittsburgh brought a class action to enjoin and have declared unconstitutional Rule B(2) of the Pennsylvania Auditor General. Rule B(2) raised an irrebuttable presumption that women students married to out-of-state residents were themselves out-of-state residents for the purpose of paying tuition. Plaintiffs brought suit against three officials of the Commonwealth charged with enforcement of the Rule, The University of Pittsburgh, Pennsylvania State University and Temple University —the three state-related universities in Pennsylvania, and Indiana University of Pennsylvania and "all other state and state-related universities and colleges" in the Commonwealth. It was held that since Rule B(2) was applied *per se* only by the University of Pittsburgh, Pennsylvania State University and Temple University, plaintiffs had standing only as to those three schools. The other state and state-related colleges were merely alleged to have applied "other similar common-law rules", and the suit was dismissed as to them.

On its facts then, the *Samuel* case has some bearing on the discussion here at hand and some relevance to the positions of both parties. In support of the *Weiner*/WPNB position, it may be noted that the class action was dismissed as to Indiana University and the other state and state-related universities on the basis that the named plaintiffs lacked standing as to those institutions. On the other hand, the class action was allowed

---

10. Weiner's four counts were brought under the National Bank Act, the Pennsylvania laws regulating interest charged by state banks, the common law and the Truth-In-Lending Act.

to go forward as to Temple University and Pennsylvania State University, even though the named plaintiffs were students only at the University of Pittsburgh. It is this second aspect of the *Samuel* decision which must be focused upon.

At no point in its discussion of Rule 23 class actions does the *Samuel* opinion ever expressly advert to the issue herein presented—the conflict between standing and representative status. This can neither enhance nor detract from the case's precedential value on the point, for its holding seems to be implicit. In this regard, the case falls within the prevailing pattern of decisions in this area. The District Court faced with the conflict outlined above follows one of two courses of action: if the Court accepts the Constitutional genesis of standing as controlling, it will hold expressly that certain parties defendant are thereby dismissed, explaining the reason. This choice is exemplified, for instance, in *Weiner* and in that portion of *Samuel* in which Indiana University and the other state colleges are dismissed.

On the other hand, if the named plaintiffs without standing as to certain defendants are retained as class representatives, this is usually done without comment, and perhaps without advertence to the issue. Chevalier, et al. v. Barid Savings Association, et al., C.A. No. 72–1599 (E.D.Pa. March 7, 1973) and that portion of *Samuel* which permits named plaintiffs to proceed against Penn State and Temple are examples of this second type of judicial resolution of the prob-

lem. La Mar v. H. & B. Novelty and Loan Co., et al., 55 F.R.D. 22 (D.Oregon 1972), appeal docketed No. 72–1485 (9th Cir.), in which the District Court expressly recognized the problem and granted representative status notwithstanding, is by far the rarer instance.[11]

Perhaps the key to the approach taken in *Samuel* will be clearer if the fact situation is outlined as follows: two plaintiffs brought suit against a number of defendants. The essence of their complaint was the inequitable treatment afforded them as a result of the operation of Rule B(2), a rule which had reality only as enforced and which, moreover, was not an entity which could be brought into court for purposes of suit. Of the defendant universities, only three admitted to enforcing the rule's provisions—the University of Pittsburgh, Pennsylvania State University and Temple University. As to these three, plaintiffs' representative status was allowed. As to those universities who had no connection with Rule B(2), representative status was disallowed.

In essence then, Rule B(2) supplied the missing element in the equation in *Samuel*. The situation is precisely analogous to that in the present case where the Master Charge card account issued by WPNB supplies the missing link. Here, one plaintiff has brought a class action against three banks, each of whom issues and administers one of two types of credit card account. The essence of plaintiff's complaint goes to the credit cards, rather than the banks themselves. Yet plaintiff is unable to bring BankAmericard and Master

---

11. Some attention might well be paid to the practical aspects of what is basically a conceptual problem. The problem here could be solved easily by the intervention of an individual who holds a Master Charge card issued by WPNB. Or, using hindsight, had the complaint been filed by a person or persons who held both cards issued by all three banks, the problem would have been avoided.

Perhaps these two considerations lay behind the fact that so little attention has been paid to the precise question in the past. Be that as it may, persons possessing all the necessary characteristics did not file the complaint and intervention cannot be fostered or even anticipated by either the Court or counsel for plaintiff.

Charge, as such, into Court as defendants if BankAmericard and Master Charge are mere labels for service umbrellas which have no existence other than as embodied and administered by member banks. Just as in *Samuel,* where Penn State and Temple applied Rule B(2), though not against named plaintiffs therein, here WPNB issues and administers Master Charge card accounts, though it has not done so as to plaintiff Mary Haas.

■ Therefore, following the reasoning employed, but not spelled out, in this Court's previous decision in Samuel et al. v. University of Pittsburgh et al., *supra,* plaintiff Mary Haas will be granted class representative status as to all three defendant banks. WPNB's motion to dismiss will be denied.

### IV.

■ The prerequisites to the maintenance of a class action as set out in Rule 23 are met in this case. The class will be defined as those persons who presently hold, or held in the two years preceding the filing of plaintiff's complaint, BankAmericard and Master Charge cards issued by defendants Pittsburgh National Bank, Mellon Bank and Western Pennsylvania National Bank.

A sufficiently large number of persons hold BankAmericard and Master Charge cards issued by the three defendant banks as to render the plaintiff class "so numerous that joinder of all members is impracticable." Rule 23(a)(1).

Common questions of law or fact are clearly presented. Rule 23(a)(2). The significance of this becomes clear when Rule 23(b) is considered. Rule 23(b) provides:

"(b) *Class Actions Maintainable.* An action may be maintained as a class action *if* the prerequisites

of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class *would create a risk of*

(A) *inconsistent or varying adjudications* with respect to individual members of the class *which would establish incompatible standards of conduct for the party opposing the class,* or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or . . . ." (Emphasis added.)

In this case, it can be seen that to have granted the motion to dismiss WPNB as a defendant party in Part III of this Opinion would have created a risk that a different determination as to liability might have been reached elsewhere against WPNB than might be reached here as to Mellon and PNB. Clearly the defenses of the defendant banks will be typical of the claims of the class since it can be assumed that WPNB administers its credit card accounts in substantially the same manner as Mellon and PNB administer theirs, Rule 23(a)(3). Thus, the "risk of inconsistent or varying adjudications" concept goes hand in hand with the requirement that common questions of law or fact be presented (Rule 23(a)(2)) which is herein met.

The requirement of Rule 23(a)(4) that "the representative parties will fairly and adequately protect the interest of the class" is satisfied also.

The only remaining issue is the evaluation of damages as to any individual cardholder, assuming a violation of

Truth-In-Lending may be found. This is simply an issue of class membership. As per Katz v. Carte Blanche, 53 F.R.D. 539 (W.D.Pa.1971), aff'd (3d Cir. 1973), rehearing granted, C.A.No.72–1054 (3d Cir. 1973), the case will proceed to trial as a class action on the issue of liability. Assuming defendants are found to have violated the relevant statutes, the class may then be terminated, with individual actions to establish class membership and to ascertain damages to proceed if deemed appropriate at that time.

An appropriate Order in accordance with this Opinion will be entered.

## ORDER

And now, to wit, this 6th day of August, 1973, in consideration of the foregoing Opinion it is ordered:

(1) that the motion of defendants Pittsburgh National Bank, Mellon National Bank and Trust Company and Western Pennsylvania National Bank to dismiss Counts I through IV for lack of jurisdiction be and the same hereby is denied and

(2) that defendant Pittsburgh National Bank's motion for summary judgment and

(3) defendant Western Pennsylvania National Bank's motion to dismiss all counts be and the same hereby are denied.

It is further ordered that plaintiff's motion for class action be and the same hereby is granted, the class being defined as those persons who presently hold, or held in the two years preceding the filing of plaintiff's complaint, BankAmericard and Master Charge cards issued by defendants Pittsburgh National Bank, Mellon National Bank and Trust Company and Western Pennsylvania National Bank.