Jordan **BROWN**, and all others similarly situated, Plaintiff-Appellee,

v.

**FIRST NATIONAL CITY BANK,**
Defendant-Appellant.

No. 1093, Docket 74-1279.

United States Court of Appeals,
Second Circuit.

Argued June 5, 1974.

Decided Aug. 14, 1974.

Sheldon V. Burman, New York City, on the brief, for appellee.

Shearman & Sterling, New York City, on the brief, for appellant.

John Leferovich, Jr., New York City, for amicus curiae New York State Bankers Ass'n.

Before KAUFMAN, Chief Judge, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

During the last decade some banks in New York have offered to their customers, as an additional banking service, various types of revolving credit or check-credit loan plans, which permit the automatic or immediate payment of a customer's overdraft on his regular checking account. At issue on this appeal is the legality of certain aspects of a plan of this type offered by defendant-appellant First National City Bank ("Citibank") to its depositors, known as the "Checking Plus Credit Agreement."

Specifically, on this appeal by both parties from a summary judgment and order of Judge Kevin T. Duffy of the Southern District (opinion reported at 365 F.Supp. 1286), we are asked to decide whether federal and state usury statutes, 12 U.S.C. § 85 and N.Y. Banking Law, McKinney's Consol.Laws, c. 2, § 108(5), permit Citibank, pursuant to its "Checking Plus" program, to charge plaintiff-appellee Jordan Brown interest on certain portions of funds transferred by Citibank to Brown's Regular checking account pursuant to its Checking Plus Credit Agreement with him and to refuse to credit deposits made by Brown to his checking account as a repayment of loans advanced to Brown from his "Checking Plus" account. We hold that these terms and conditions are valid and enforceable, and we reverse so much of the district court's order as enjoined Citibank from charging Brown interest on the entire amount of funds made available to him pursuant to the "Checking Plus" agreement. We further direct the

district court to dismiss Brown's complaint in its entirety.

Under the "Checking Plus Credit Agreement", which was introduced in 1966, Citibank agrees with a regular checking account depositor that, if the depositor's checking account should be overdrawn, (1) the bank will automatically debit his Checking Plus account, which is opened by him at the time when he enters into the agreement, and credit to his regular checking account, an amount equal to the first multiple of $100.00 above the amount of the overdraft,[1] or (2) the depositor may give the bank a written authorization to debit his Checking Plus account and credit to his Regular checking account a specific sum, which may be limited by him to the amount of the overdraft. The amount thus debited to the customer's account becomes a loan repayable with interest at the rate of .03333% per day—the maximum rate permitted by state law[2]—in minimum monthly installments. These repayments must be made directly to the Checking Plus account and must be accompanied "by a properly completed payment ticket (enclosed with the monthly Checking Plus statement) or by any other properly completed form of notice . . . authorized by the bank." The agreement further provides that as collateral security for the payment of any indebtedness under the program the bank is given a "security interest and/or right to set-off in and to all monies, securities and other property of the [depositor] now or hereafter on deposit with or otherwise held by or coming into the possession or under the control of the bank . . . ." The bank further retains the right to terminate the agreement when the depositor reaches "70 years of age, or at any other time, upon written notice by the bank . . . ."

After entering into a "Checking Plus Credit Agreement" with Citibank early

---

1. Thus, where no written authorization is received but an account is overdrawn by $10.00, $100.00 will be transferred. If the ac-count is overdrawn by $105.00, $200.00 will be transferred.

2. See New York Banking Law § 108, subd. 5 (b).

in July of 1972, appellee Brown on five separate occasions in August and September, 1972, overdrew his checking account and elected to receive credits in multiples of $100.00 rather than authorize credits limited to the specific amounts of the overdrafts.[3] Additionally, on one occasion in September, he made a deposit to his Regular checking account which, pursuant to the agreement, Citibank did not apply to the outstanding debit balance in appellee's Checking Plus account.

In a complaint filed on October 24, 1972, on behalf of himself and all other Citibank Checking Plus customers (asserted to number in the thousands), Brown claimed that Citibank violated § 85 of the National Bank Act, 12 U.S.C. § 85 and § 108(5) of the New York Banking Law by charging him daily interest at the maximum legal rate on the full amounts credited to his checking account in multiples of $100.00, rather than on the lesser amounts of the overdrafts, and on previously imposed interest charges and on service and maintenance charges.

After both parties moved for summary judgment the district court, in an opinion filed on November 7, 1973, (1) upheld Brown's claim to the extent that it challenged the bank's practice of charging interest on the amounts by which the credits exceeded the overdrafts (2) dismissed his claim that Citibank was charging interest on interest, since records submitted by the bank, which were undisputed by Brown, clearly contradicted the claim and (3) denied summary judgment to either party on Brown's claim that Citibank was charging him interest on service and maintenance charges, since the question could not be resolved "until the defendant discontinues its practice of charging interest on multiples of a hundred-dollars rather than the amount of the overdraft." Finally, the court refused to order the bank to credit deposits made by Brown to his checking account as repayment of the transfers from his Checking Plus account. The court held that the bank could lawfully require the repayments to be credited to the Checking Plus loan account since such repayments did not "entail additional expense or sacrifice" of the kind referred to in [section 108(5)(f) of the New York Banking Law]." Both parties have appealed from the district court's judgment.

## DISCUSSION

■ Before reaching the merits, we must consider a threshold issue which neither of the parties raised here or in the district court. The district court's jurisdiction was properly invoked pursuant to 28 U.S.C. §§ 1337, 1355, since Brown was technically asserting a claim under the National Bank Act, 12 U.S.C. § 85 and seeking to recover the penalties provided for in 12 U.S.C. § 86. However, in regulating the interest-charging practices of national banks such as Citibank those sections contain no independent provisions but merely incorporate the laws of the various states. Thus § 85 provides that "[a]ny association may take, receive, reserve and charge on any loan . . . interest at the rate allowed by the laws of the State, Territory, or District where the bank is located." The provision is clearly enabling rather than restraining and was intended solely to place national banks in a position to compete with all other banks in the country. See Tiffany v. National Bank, 18 Wall. 409, 85 U.S. 409, 21 L. Ed. 862 (1873).

■■ Since the federal statute had no independent operation and only state law questions were presented, the district court could, and probably should, have postponed its decision until Brown's claim was presented to and adjudicated by the courts of New York. Cf. Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Louisiana Power & Light Co. v. Thibodaux City, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959). While we

---

3. Whereas without the transfers Brown would have overdrawn his account by approximately $1000.00, he received transfers totalling $1100.00.

recognize that abstention should be reserved for exceptional circumstances, Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), in view of its substantial costs for litigants, see Baggett v. Bullit, 377 U.S. 360, 375–379, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1969), it would have been appropriate in this case, since the district court was dealing with part of a complicated and comprehensive regulatory statute intended to strike a balance between differing local interests. See Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); Alabama Public Service Commission v. Southern R. Co., 341 U.S. 341, 71 S.Ct. 775, 95 L.Ed. 1016 (1951). In enjoining Citibank from continuing a practice which its competitors in neighboring states clearly have power to do, see N.J.S.A., Article 12–A, § 17.9A–59.1, there was the danger that the district court was frustrating a significant state policy in favor of permitting commercial banks located within the state to be "free to compete". See New York State Banking Department, Report of the Superintendent's Committee on Financial Reform 4 (1974).

■ With these considerations in mind and in deference to New York's overriding interest in this litigation, we would reverse the district court on abstention grounds alone if Citibank had raised the issue or if we ourselves were in any doubt as to the proper meaning of the state statute. However, while the abstention doctrine is designed primarily to serve such public policies as comity in federal-state-relations, see Comment, Federal-Question Abstention: Justice Frankfurter's Doctrine in an Activist Era, 80 Harv.L.Rev. 605 (1967), the failure of a defendant even to raise the abstention issue is entitled to some consideration when an appellate court is deciding whether the plaintiff should be required to start all over again. See AFA Distributing Co. Inc. v. Pearl Brewing Co., 470 F.2d 1210, 1213 (4th Cir. 1973). Furthermore, abstention is inappropriate when a federal court believes the state law is clear, see Chicago v. Atchison Topeka & Santa Fe Railway Co., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed. 2d 1174 (1957); Toomer v. Witsell, 334 U.S. 385, 392 n. 15, 68 S.Ct. 1156, 92 L. Ed. 1460 (1948), and a state statute may be clear even where, as here, it has not been ruled upon by a state court. See Executive Properties, Inc. v. Sherman, 223 F.Supp. 1011, 1014 (D.Ariz. 1963).

■ Turning to the merits, in our view § 108(5) of the New York Banking Law on its face clearly permits the practice which the district court enjoined. The statute permits banks to "establish *credits* under written agreements with borrowers pursuant to which one or more *loans* or *advances* to or for the account of a borrower may be made from time to time, by means of honoring one or more checks or *other written orders or requests of the borrower*," (emphasis supplied) and to charge "interest on such loans or advances at the rate of [one thirtieth of one per cent per day]." The district court concluded that "[a]dvancing funds in multiples of a hundred dollars does not constitute honoring a check." See 365 F.Supp. at 1289. While this may be true, it overlooks the statute's additional provision authorizing banks to establish credits, "by means of written orders or requests of the borrower." The Checking Plus Credit Agreement provides that the customer may either draw a check against insufficient funds, in which case he will receive the hundred dollar multiple, or he may submit a written authorization specifically requesting the transfer of a lesser amount. Thus a check drawn by the depositor against insufficient funds clearly constitutes as much of a "written order or request" by the borrower to Citibank for a loan and transfer in the next highest multiple of $100.00 as if it had expressly said so. Otherwise, the borrower would not have drawn the check without first submitting a written authorization to debit his Checking Plus account in the amount of the overdraft and credit his checking account accordingly.

The district court also concluded that there was no "loan" or "advance" of the funds transferred in excess of the overdraft until the depositor had actually drawn checks on that amount. Judge Duffy based this conclusion on his assumption that prior to the transfer the funds were "at the plaintiff's disposal as credit in the 'Checking Plus Account',", going on to say that "[i]t is difficult to see how the mere transfer of money from one account to another can create the right to charge interest on it before it is actually withdrawn by the borrower." 365 F.Supp. at 1289. The record, however, demonstrates conclusively that this conclusion, and its premise, are in error. Prior to the transfer of the funds, such funds were not unqualifiedly at Brown's disposal. Citibank had reserved the right to terminate the Checking Plus Agreement at any time merely by giving written notice. Prior to the transfer Brown had at most the possibility of a line of credit contingent on the agreement *not* being terminated by will by Citibank. After the transfer, on the other hand, he had a firm demand deposit available for his immediate and unrestricted use and no longer subject to the bank's right of termination. The demand deposit represented an indebtedness owed by Citibank to Brown, which could be pledged, levied upon or attached. See N.Y.C.P.L.R., McKinney's Consol.Laws, c. 8, §§ 5201, 6202. Thus the transfer between accounts was a significant event which comes within the ordinary definition of a loan. See N.Y. Banking Law § 108(5)(f), Uniform Consumer Credit Code § 3.106(2).

Nor do we agree with appellee that the loans in multiples of $100.00 should be treated as an indirect method of evading the usury laws on the ground that they were forced upon him, like a "compensating balance" scheme whereby a borrower, in order to borrow $100.00 at 6 per cent interest, must deposit $50.-00 with the lender for the period of the loan. See Austin and Soloman, The Antitrust Implications of Compensating Balances, 58 Va.L.Rev. 1 (1972).

First, aside from the fact that the Checking Plus Credit Agreement is a purely voluntary arrangement on the customer's part, he is not obliged, even after entering into it, to accept loans in multiples of $100.00 since he has the alternative of submitting a written authorization for the transfer of whatever lesser amount will meet an overdraft. Second, even if the customer does take the multiple of $100., there is no compulsion upon him to leave any excess over his overdraft in his checking account. He can do anything with the excess that he wants. He can even draw it all out immediately and use it to make up the corresponding debit in his Checking Plus account, thus reaching the same result as it he had used the written authorization in the first place. We find nothing unconscionable in all of this. Regardless of which option he chooses, the customer receives substantial benefits under the Checking Plus agreement since it avoids the embarrassment, financial penalties,[4] and legal liability frequently involved in overdrawing a checking account.[5]

Our conclusion that § 108(5) of the Banking Law permits Citibank's $100.00 multiple overdraft lending arrangement is supported by an amicus curiae brief submitted by the New York State Bankers Association, the trade organization which drafted the section. Additionally, we note that the New York Legislature has amended § 108(5), at least four times since Citibank and several other commercial banks first introduced this type of lending, without

---

4. Ordinarily, Citibank imposes a $5.00 charge on customers who draw a check against insufficient funds.

5. Brown's claim that Citibank gains additional lending power from making the overdraft loans in multiples of $100.00 is frivolous since the practice gains Citibank no additional "currency and coin." See 12 U.S.C. § 461(c)(2).

attempting in any way to prohibit it.[6] Such legislative inaction provides a further basis for concluding that the Legislature intended to sanction the challenged practice. Cf. Zachary v. Macy & Co., 31 N.Y.2d 443, 460, 340 N.Y.S.2d 908, 293 N.E.2d 80 (1972). Nor have the administrative agencies responsible for monitoring compliance with the federal and state banking laws—the Office of the Comptroller of the Currency [7] and the New York Banking Department [8]—ever disapproved the practice of making overdraft loans in multiples of $100.00 which is currently practiced widely in New York by both state and national banks.[9] Such tacit approval by the agencies charged with enforcing the statutes is entitled to considerable weight. Cf. Investment Company Institute v. Camp, 401 U.S. 617, 626–627, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); Louisville R R v. United States, 282 U.S. 740, 759, 51 S.Ct. 297, 75 L.Ed. 672 (1930); NLRB v. Medo Photo Supply Corp., 135 F.2d 279 (2d Cir. 1943), aff'd, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); Commissioner v. Pepsi-Cola Niagara Bottling Corp., 399 F.2d 390 (2d Cir. 1969). Finally, if any additional help were needed, the New Jersey statute dealing with the same subject matter, which was plainly drafted with the same general policies and objectives in mind, see 2A Sutherland, Statutory Construction §§ 51.06, 52.03 (4th Ed. 1973) expressly permits the practice challenged here by providing:

> "The advance loan contract may provide that the amount of the advance loan shall equal the amount by which the account is overdrawn, or it may provide that, when the amount of the overdraft is not in a sum equal to an even multiple of $100.00, or an even multiple of such other sum, less than $100.00, as the contract may prescribe, *the amount of the loan shall equal the nearest even multiple of $100.00*, or the nearest even multiple of such other sum, less than $100.00, as the contract may prescribe, which is greater than the amount of such overdraft." N.J.S.A. Article 12A, § 17: 9A–59.2, subd. B (1973–74 Cum.Supp.) (emphasis added).

In light of this additional evidence which merely comports with the words of the statute, we conclude that Citibank's Checking Plus program, whereby checks drawn against insufficient funds are deemed written orders or request for a transfer of funds in the next highest multiple of $100.00 above the amount of the overdraft, is lawful.

■ Brown's cross-appeal from that part of the district court's decision upholding Citibank's refusal to credit deposits to Brown's checking account against debits in his Checking Plus account is frivolous. The Checking Plus agreement clearly states how the transfers under the agreement are to be repaid. The prescribed method, which is flagged for the customer every time he receives his monthly "Checking Plus Statement", including repayment tickets, hardly entails any significant "additional expense or sacrifice" of the kind pro-

---

6. See 1968 New York Laws, c. 1072, § 7; 1969 New York Laws, c. 39, § 3, c. 778, § 3, c. 840, § 1.

7. See 12 U.S.C. § 1.

8. See New York Banking Law §§ 10, 36.

9. According to an affidavit submitted by counsel for the New York State Bankers Association, John Leferovich, Jr., an "informal" survey concluded by the Association established "that most of the commercial banks in the State of New York, which are members of the Association and offer some form of "check loan" or "check credit", have for several years utilized credit agreements similar to that of First National City Bank herein, i. e., such banks make check loans, *inter alia*, in "multiples of $100.00". According to the Association, state-chartered banks making overdraft loans in multiples of $100.00 include, in New York City alone, the Chemical Bank, the Irving Trust Co., the Bank of New York, the Marine Midland Bank, and Bankers Trust Co.

hibited by the statute. See N.Y. Banking Law § 108(5)(f).

The judgment of the district court is reversed insofar as it awards relief to plaintiff. Otherwise it is affirmed. The district court is directed to dismiss plaintiff-appellee's complaint in its entirety.