# Third District Court of Appeal

## State of Florida

Opinion filed March 22, 2023.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D22-181
Lower Tribunal No. 17-22854
_____

**Florida Power & Light Company,**
Appellant,

vs.

**Heydi Velez, et al.,**
Appellees.

An Appeal from a non-final order from the Circuit Court for Miami-Dade County, David C. Miller, Judge.

Squire Patton Boggs (US), LLP, Alvin B. Davis and Digna B. French; Joseph Ianno, Jr. (Juno Beach); Boies, Schiller & Flexner, LLP, Stuart H. Singer, Sashi C. Bach, and Pascual Oliu (Ft. Lauderdale), for appellant.

Armas Bertran Zincone and J. Alfredo Armas; MSP Recovery Law Firm, John H. Ruiz and Alexis Fernandez; Acosta Law Firm, Julio C. Acosta and Simeon Genadiev; Dorta Law and Gonzalo R. Dorta, for appellees.

Before FERNANDEZ, C.J., and LINDSEY, and HENDON, JJ.

FERNANDEZ, C.J.

Florida Power & Light Company ("FPL") appeals the trial court's non-final order certifying a class of FPL customers who sued FPL for breach of contract and gross negligence after Hurricane Irma. Because the trial court correctly determined that plaintiffs satisfied the elements necessary to establish class treatment of their claims against FPL under Florida Rule of Civil Procedure 1.220(b)(3), we affirm.

## **FACTS AND PROCEDURAL BACKGROUND**

In 2005, FPL filed a base rate proceeding before the Public Service Commission ("PSC"). The parties reached a Settlement Agreement whereby FPL would be allowed to recover storm restoration costs and replenish its Storm-Recovery Reserve through the monthly storm surcharge.

Thereafter, FPL customers were affected by Hurricanes Dennis, Katrina, Rita, and Wilma. FPL petitioned the PSC to approve the issuance of storm recovery bonds pursuant to section 366.8260, Florida Statutes (2005). The bonds would allow FPL to recover over $213 million and $815 million for 2004 and 2005 storm costs; replenish its storm-recovery reserve to a level of approximately $650 million; and recover interest incurred through the bond issuance date and bond issuance costs of $23 million. As a result of the bonds, FPL customers would have to pay a monthly storm

surcharge. In return, FPL was to improve and strengthen its facilities for future storms, remove decaying utility poles, and remove vegetation that was making contact with local power lines.

During hearings the PSC scheduled on the bond issue, FPL stated the storm charge would be used for, among other things, restoring FPL's facilities to their pre-storm condition; repairing and replacing poles that were leaning or were braced during the initial restoration stage; replacing lightning arrestors; repairing or replacing capacitor banks; and strengthening system infrastructure. FPL's Storm Secure Plan further would adopt the National Electric Safety Code ("NESC") to improve FPL's system infrastructure to withstand extreme wind conditions. The PSC approved the order and the issuance of the storm-recovery bonds in the amount up to $708 million.

Later, in 2012, FPL petitioned for a permanent increase in base rates and charges. It requested a base rate increase of $528 million. A Settlement Agreement was reached, and the PSC gave FPL a revenue increase of $378 million effective January 1, 2013.

In 2016, FPL requested another base rate increase. FPL's request was intended to "reduce outages and enable FPL to restore power for customers and help local communities recover more quickly when severe weather strikes." The PSC authorized a revenue increase of $400 million effective

3

January 1, 2017. Also in 2016, FPL filed a petition seeking to implement a storm surcharge to recover $318.5 million for Hurricane Matthew restoration costs and to replenish its Storm-Recovery Reserve. The PSC granted FPL's 2017 storm surcharge on each customer's monthly residential bill, beginning on March 1, 2017, which was to last for twelve months.

On March 15, 2016, FPL filed its petition with the PSC for approval of FPL's Storm Hardening Plan. FPL stated it would comply with NESC extreme wind loading ("EWL") standards by hardening its system so that it would withstand winds of 145, 130, and 105 mph in the three different wind regions of the state.

In September 2017, Hurricane Irma sideswiped Florida. Named class members Heydi Velez, Miriam Perez, Guillermo Patino-Hidalgo, Enrique Arguelles, Mercedes Sastre, Ruben N. Mendiola, Carlos M. Colina, Shalom Navarro, and Jose Zarruk (collectively, "plaintiffs") were FPL customers whose power went out for an extended period after Hurricane Irma. As customers, they entered into a contract with FPL, the Tariff, for electrical services that set out the parties' obligations. In the Tariff, FPL agreed to use "reasonable diligence at all times to provide continuous service and storm recovery activities."

During Hurricane Irma, the very highest sustained wind recorded by the National Weather Service was 115 mph in Marco Island where the storm first made land fall. The highest gust recorded was 142 mph near Naples Airport. Although Irma did not approach any county east of Lake Okeechobee, over 75% of FPL customers in South Florida lost power for close to a week. In the western half of South Florida, over 90% of FPL customers lost power for over a week.

On February 1, 2018, plaintiffs brought a class action lawsuit against FPL. They alleged one count for breach of contract seeking compensatory damages for FPL's failure to comply with its contractual obligations to use reasonable diligence at all times to provide continuous service in accordance with FPL's Tariff and industry standards. Plaintiffs alleged that each of the individual plaintiffs entered into a uniform contractual agreement with FPL for services (the Tariff), for which plaintiffs paid a monthly fee. They alleged each plaintiff was individually charged a surcharge for storm restoration and hardening activities, pursuant to section 366.8260, Florida Statutes (2017). Plaintiffs suffered consequential damages such as loss of food and incurred expenses, loss of income, loss of sleep, intense discomfort, and more.

The Tariff specifically stated that FPL "will use reasonable diligence at all times to provide continuous service at the agreed nominal voltage" and

storm recovery activities. Plaintiffs claim that FPL failed to use reasonable diligence by failing to meet NESC standards and its own standards, and that as a result of FPL's breaches, Florida residents suffered unnecessary and prolonged power outages from Hurricane Irma that sideswiped South Florida.

In Count II for gross negligence, plaintiffs claimed FPL "acted with reckless, willful, and wanton disregard for plaintiffs in the gross negligent maintenance and management of its system infrastructure, storm organization, restoration plan, and outright failure to restore, replace, and better the distribution system and hazards posed by vegetation and trees close to power lines." They alleged FPL became aware of this need after previous storms hit Florida and undertook a duty to strengthen its distribution system in anticipation of the next hurricane. Plaintiffs further alleged that FPL was grossly negligent in performing various actions such as in replacing outdated grids, decaying utility poles, and hardening its power grid after the prior storm; failing to clear vegetation from the vicinity of distribution facilities and equipment; failing to clear vegetation from all feeder circuits serving top critical infrastructures prior to the peak of hurricane season; and failing to replace defective equipment, including but limited to, company power poles, power lines, and transformers.

Thereafter, FPL moved to dismiss the action, which the trial court denied. FPL then petitioned this Court for a writ of prohibition to require the parties to take their dispute before the PSC. This Court denied the writ in Florida Power and Light Company v. Velez, 257 So. 3d 1176 (Fla. 3d DCA 2018). Thus, the matter returned to the trial court.

Plaintiffs then proceeded with class discovery. Pursuant to a discovery settlement agreement the parties entered, FPL produced data regarding its hurricane readiness and performance delivery reports to the PSC. FPL also produced data relating to power outage assessments, diagnoses, causes, and repairs during and after Hurricane Irma.

On October 18, 2021, plaintiffs filed their Motion for Entry of Class Certification Order. The plaintiffs moved to certify the following class:

> All persons and business owners who reside and are otherwise citizens of the state of Florida that entered into contractual agreement with FPL for electrical services, were charged a storm charge, experienced a power outage after Hurricane Irma, and suffered consequential damages, directly and proximately, because of FPL's breach of contract and/or gross negligence.

The trial court held a three-day evidentiary hearing on class certification and other issues in December 2021. Plaintiffs argued that the trial court should focus not on who would prevail on the issues raised related to the breach of contract or gross negligence counts, but rather whether the requirements of rule 1.220 were met. Plaintiffs contended that based on

7

FPL's own structured data, FPL could identify exactly which customer lost power, at what address, when they lost power, and the reason why they lost power. At the end of the hearing on the third day, the trial court granted plaintiffs' motion and certified the class. Thereafter, the trial court entered its detailed, twenty-four page "Order Granting Plaintiffs' Motion for Class Certification." FPL then appealed.

## DISCUSSION

"A trial court's order certifying a class is a non-final appealable order that is reviewed for an abuse of discretion." Miami Auto. Retail, Inc. v. Baldwin, 97 So. 3d 846, 851 (Fla. 3d DCA 2012). This is because "'the determination that a case meets the requirements of a class action is a factual finding,' which falls within a trial court's discretion." Sosa v. Safeway Premium Fin. Co., 73 So. 3d 91, 103 (Fla. 2011). "[T]he appellate court must fully recognize the superior vantage point of the trial judge and should apply the 'reasonableness' test to determine whether the trial judge abused his discretion. If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion." Canakaris v. Canakaris, 382 So. 2d 1197, 1203 (Fla. 1980). "A trial court should resolve doubts with regard to

8

certification in favor of certification, especially in the early stages of litigation."

Sosa, 73 So. 3d at 105.

FPL contends that plaintiffs did not meet their burden under Florida Rule of Civil Procedure 1.220(b)(3) because individual issues predominate in this case, and a class action is not manageable or superior to other forms of resolving this controversy. We find no merit in this argument.

Parties seeking class certification have the burden of pleading and proving each element of Florida Rule of Civil Procedure 1.220(a) and one of the three requirements of Florida Rule of Civil Procedure 1.220(b). Terry L. Braun, P.A. v. Campbell, 827 So. 2d 261, 265 (Fla. 5th DCA 2002). Under Rule 1.220(a), the four prerequisites for class certification are numerosity, commonality, typicality, and adequate representation. Broin v. Philip Morris Cos., 641 So. 2d 888 (Fla. 3d DCA 1994). FPL makes the general statement that plaintiffs have not satisfied the elements of Rule 1.220(a). However, it does not address this argument in its briefs. We have carefully reviewed the record and find no abuse of discretion in the trial court's determination that the class established the four elements under Rule 1.220(a). Love v. General Dev. Corp., 555 So. 2d 397 (Fla. 3d DCA 1989).

In addition to establishing numerosity, commonality, typicality, and adequacy of representation, plaintiffs must also demonstrate that the action

9

meets the criteria under at least one basis for class certification under Rule 1.220(b). Here, plaintiffs sought class certification under rule 1.220(b)(3). This rule states:

> (b) Claims and Defenses Maintainable: A claim or defense may be maintained on behalf of a class if the court concludes that the prerequisites of subdivision (a) are satisfied, and that
> …
> (3) … the questions of law or fact common to the claim or defense of the representative party and the claim or defense of each member of the class predominate over any question of law or fact affecting only individual members of the class, and class representation is superior to other available methods for the fair and efficient adjudication of the controversy. …

Thus, predominance and superiority must be shown. <u>Freedom Life Ins. Co. of Am. v. Wallant</u>, 891 So. 2d 1109, 1118 (Fla. 4th DCA 2004) ("For class certification to be appropriate under Rule 1.220(b)(3), 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as whole, must predominate over those issues that are subject only to individualized proof.'").

Plaintiffs must first establish that common questions of law and fact predominate over individual, plaintiff-specific issues. Fla. R. Civ. P. 1.220(b)(3); <u>Sosa</u>, 73 So. 3d at 111. "Florida courts have held that common questions of fact predominate when the defendant acts toward the class members in a similar or common way." <u>Sosa</u>, 73 So. 3d at 111. "The methodology employed by a trial court in determining whether class claims

10

predominate over individual claims involves a proof-based inquiry." Id. at 112. Thus, a class representative establishes predominance if "the class representative can prove his individual case and, by so doing, necessarily prove the cases for each of the other class members." InPhyNet Contr. Servs. v. Soria, 33 So. 3d 766, 771 (Fla. 4th DCA 2010).

Here, Rule 1.220(b)(3) certification was proper because even where some individualized issues of proof exist in a case, where an issue raised by a common contract provision predominates, "the better reasoned approach is to maintain the suit as a class action and, if required after further development of the issues, permit the lower court to create subclasses." Paladino v. Am. Dental Plan, Inc., 697 So. 2d 897, 899 (Fla. 1st DCA 1997). Further, "[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1261 (11th Cir. 2003).

The record supports the trial court's conclusion that plaintiffs established that common questions of law and fact predominate over individual plaintiff issues. FPL's Tariff is a form document, and FPL admitted it applies to all plaintiffs and class members. As previously discussed, FPL drafted the Tariff, and it was presented to its customers on a take it or leave

it basis. Plaintiffs and class members had no bargaining power in the drafting of the Tariff. The Tariff also incorporates FPL's "Service Standard" as previously discussed and incorporated the latest edition of the NESC. The Tariff further provides for the storm charge that plaintiffs referenced in their amended complaint. Plaintiffs claim that due to FPL's breach of the Tariff, plaintiffs and class members experienced consequential damages.

Predominance exists where common questions can be answered by use of computerized software systems. Roper v. Consurve, Inc., 578 F.2d 1106, 1113 (5th Cir. 1978) ("While it may be necessary to make individual fact determinations with respect to charges, if that question is reached, these will depend on objective criteria that can be organized by a computer, perhaps with some clerical assistance."). As the trial court noted in its order, "It is well-settled in data-driven cases like this one, even if there are potential individualized determinations, that 'the necessity of making individualized factual determinations does not defeat class certification if those determinations are susceptive to generalized proof like [business] records.' Minns v. Advanced Clinical Employment Staffing LLC, 2015 WL 3491505, at *8 (N.D. Cal. 2015) …".

The evidence showed that FPL uses "cause codes" among other data related to customer power outage, which the trial court noted would provide

12

the court with "a reasonable methodology for generalized proof of class-wide impact." Thus, FPL's conduct in determining the cause of power loss for each client is the same. In addition, the standard Tariff is the same one given to all customers. Thus, the evidence used to prove one of the named plaintiffs' breach of contract claims is the same evidence that will be used to prove the rest of the class members' breach of contract claims. Accordingly, plaintiffs can use FPL's data to prove FPL's liability for the entire class. Regarding this predominance factor, the trial court further noted:

> FPL deploys "patrollers" and "forensic patrollers" in order to determine outage causes and restore power. FPL uses multiple data systems to track that information, makes outage information and restoration projections available to customers in real-time, draws conclusions from its data-rich systems, and reports outage causes (and makes its data available) to Florida's Public Service Commission. It stands to reason that FPL has identified the cause of an outage where it has been able to turn the power back on. FPL, though, has now dedicated the bulk of its presentation to undermining the accuracy of its own records. The Court is unmoved by those efforts.

> FPL's "very business model includes gathering and distilling information from a variety of sources in order to [determine the cause of outages]." . . . And, in general, "courts do not look favorably upon the argument that records a defendant treats as accurate for business purposes are not accurate enough to define a class." (citations omitted). The Court finds that the evidence supports Plaintiffs' theory and methodology for utilizing FPL's business records and data systems for determining liability on a class-wide basis.

Similarly, regarding the gross negligence claim, the court found that "these issues are common to Plaintiffs and all putative class members and will be resolved by common proof that does not vary from customer to customer based on FPL's course of conduct to utilize the same data systems and methodologies for all 5.6 million customers." The court specifically found from the information presented to it by FPL that FPL "blurred" the difference between how it collected data on customer outages on a "blue-sky day" (non-hurricane days) as opposed to how it collected data on customer outages during a hurricane. On a "blue-sky" day, the "cause code" pertaining to a power outage for a customer was the actual cause for a customer's power outage. However, FPL trained its employees to select the "cause code" of "hurricane" as the actual cause of a customer's power outage following a hurricane like Hurricane Irma. Thus, the trial court found that whether FPL adopted or did not adopt these procedures/training instructions evidenced a conscious disregard of an imminent or "clear and present danger." The court stated that "a jury could find that FPL's conscious decision to categorically subject information about outages following a storm to a different standard than information about outages on a blue-sky day, and inherently invites breaches of the type that are alleged above to be grossly negligent." The court noted that a jury could also find that FPL understood the risks

associated with its manner of documenting "causes" of customer power outages after a storm, and its integration or lack of integration with other FPL databases and that because FPL was aware, its common course of conducted evinced a conscious disregard of an imminent or "clear and present danger." Thus, the court correctly determined that common questions of law and fact predominated over individual questions in this case.

In addition, contrary to FPL's position, the superiority requirement of Rule 1.220(b)(3) was also met in this case. Under Rule 1.220(b)(3), the court examines whether class representation is superior to other available methods for the fair and efficient adjudication of the controversy. "Three factors for courts to consider when deciding whether a class action is the superior method of adjudicating a controversy are (1) whether a class action would provide the class members with the only economically viable remedy; (2) whether there is a likelihood that the individual claims are large enough to justify the expense of separate litigation; and (3) whether a class action cause of action is manageable." Sosa, 73 So. 3d at 116.

Here, the trial court was correct in concluding that class representation was superior to other methods of adjudication. The court accurately noted that there were potentially millions of prospective class members and that

15

their small, individual economic claims were not large enough to justify each individual plaintiff filing a separate action. Thus, the court found a class action would be the "most economically feasible remedy given the potential individual damage recovery for each class member." In addition, a class action recovery system in this case would be a more manageable and efficient use of judicial resources than if each plaintiff was required to file their own individual claim against FPL. The trial court stated in its order that MSP Recovery LLC's (class action plaintiff trial counsel) chief information officer testified in his deposition that through MSP Recovery, LLC, plaintiffs would have the ability to assess FPL's data regarding this class action. The chief information officer reviewed the documents produced by FPL and testified that FPL's data contain outage tickets and other information used to calculate metrics and pinpoint the cause of a customer's power outage. Consequently, the trial court was correct in determining that plaintiffs presented evidence that a class action was superior to other available methods for resolving this controversy.

### CONCLUSION

The trial court correctly concluded that in this case, common questions of law and fact predominate over individual questions, and that class

16

representation is superior to other methods of adjudication. Accordingly, finding no abuse of discretion in the trial court's decision to certify the class under Rule 1.220(b)(3), we affirm the trial court's "Order Granting Plaintiffs' Motion for Class Certification."

Affirmed.